David Lichtenstein, *pro hac vice*
Law Office of David Lichtenstein, LLC
1556 Williams Street, Suite 100
Denver, CO 80218
Tel: (303) 831-4750
Colo. Atty. Reg. No. 11408
Email: dave@lichtensteinlaw.com

Harold V. Dye
Dye & Moe, P.L.L.P.
120 Hickory Street; Suite B
Missoula, MT 59801-1820
Tel: (406) 542-5205
E-mail: hdye@dyemoelaw.com

Attorneys for Plaintiffs Clifton Bo Cleveland
Abbott, Clifton Cleveland Abbott,
W. Scott Abbott, and Jill Abbott

### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| CLIFTON BO CLEVELAND ABBOTT, CLIFTON CLEVELAND ABBOTT, W. SCOTT ABBOTT, AND JILL ABBOTT, <br><br> Plaintiffs, <br><br> v. <br><br> CHRISTOPHER GREGG THOMAS <br><br> Defendant. | Case No.: 19-60287-BPH <br><br> Chapter 7 |
| In Re: <br><br> CHRISTOPHER GREGG THOMAS <br><br> Debtor | Adversary No. _____ |

**COMPLAINT OBJECTING TO DISCHARGE PURSUANT TO 11 U.S.C. §523**

Clifton Bo Cleveland Abbott, Clifton Cleveland Abbott, W. Scott Abbott, and Jill Abbott, creditors and interested parties in the above-captioned case, complain as follows:

## INTRODUCTION

1. This Court has jurisdiction over this cause pursuant to 28 U.S.C. §1334 and 11 U.S.C. §523. This is a core proceeding within the meaning of 28 U.S.C. §157.

2. Plaintiff Clifton Bo Cleveland Abbott, a former employee of Prospect Agency Group, Inc., a Wyoming corporation controlled by Debtor Christopher Gregg Thomas, was induced by Thomas through fraud and false pretenses to incur certain debts to banks, including credit card issuers, and investors. Clifton Bo Cleveland Abbott has paid the debts to banks in part, remains liable on those debts in part, and has suffered damage to his credit as a result of the indebtedness.

3. Plaintiffs Clifton Cleveland Abbott, W. Scott Abbott, and Jill Abbott were induced by Thomas through false pretenses, fraud, including fraudulent concealment and securities fraud, to invest money with Prospect and its agents, and lost virtually all of their investments as a result of the Debtor's defalcation in a fiduciary capacity.

## PARTIES

4. Plaintiff Clifton Bo Cleveland Abbott (Bo Abbott) is a resident of Arvada, Jefferson County, Colorado.

5. Plaintiff Clifton Cleveland Abbott (Clifton Abbott) is a resident of Liberal, Kansas.

6. Clifton Abbott is Bo Abbott's father

2

7. Plaintiffs W. Scott Abbott and Jill Abbott (Scott and Jill Abbott) are residents of Ft. Gibson, Oklahoma.

8. W. Scott Abbott is Clifton Abbott's cousin.

9. Defendant Christopher Gregg Thomas (Thomas), the Debtor, is a resident of Bozeman, Montana.

**GENERAL ALLEGATIONS**

10. Prospect Agency Group, Inc. (Prospect) is a Wyoming Corporation authorized to do business in Colorado.

11. Prospect is itself the Debtor in an open Chapter 7 proceeding in the U.S. Bankruptcy Court for the District of Wyoming, Case No. 18-20180, filed March 23, 2018.

12. At all relevant times, Prospect was engaged in the business of selling property and casualty insurance policies.

13. At all relevant times, Thomas has been the chief executive officer of Prospect.

14. In approximately December 2016, Thomas became the controlling shareholder of Prospect.

15. Bo Abbott began employment by Prospect at its Thornton, Colorado office in suburban Denver in September 2015.

16. Bo Abbott's employment by Prospect involved acting as an insurance agent and assisting in the operations of Prospect's offices in the Denver Metropolitan Area.

17. Bo Abbott was compensated by Prospect on a salary basis until he resigned his employment in September 2017.

18. Bo Abbott owns 2% of the shares of Prospect.

19. In or about August 2016, Clifton Abbott loaned $42,000 to finance operations conducted by Prospect.

20. Thomas, using the DocuSign electronic signature service, executed a Promissory Note (the Note or Clifton Abbott Note) to Clifton Abbott for $42,000, due in April 2017, which provided for interest at the rate of ten percent per annum.

21. The Note provided that Clifton Abbott would be entitled to recover his costs of collection, including reasonable attorney fees.

22. The Note was collateralized by a security interest in favor of Bo Abbott in all of Thomas's shares in Prospect.

23. On November 22, 2016, Scott and Jill Abbott entered into an Agreement for Mutual Business Interest and Revenue Sharing (Scott and Jill Abbott Revenue Sharing Agreement) under which Scott and Jill Abbott invested $40,000 so that Prospect's agents could finance and open Prospect's Lakewood, Colorado office.

24. The Scott and Jill Abbott Revenue Sharing Agreement provided that the $40,000 was to be repaid to Scott and Jill Abbott with monthly payments of 5% of an amount equal to the gross operating revenue of the Lakewood office less customer insurance premiums held in trust for the insurance carriers until the $40,000 was repaid "separate and above the 5% monthly payment."

25. The Scott and Jill Abbott Revenue Sharing Agreement was signed by Thomas and Bo Abbott as "agents."

26. At all relevant times, Thomas and Bo Abbott were acting as agents of Prospect.

27. The obligations to Scott and Jill Abbott under the Scott and Jill Abbott Revenue Sharing Agreement were secured by a security interest in "the office location, its furnishings, assets, and bank accounts."

28. Thomas never established any bank accounts for the Lakewood office.

29. Thomas caused the $40,000 invested by Scott and Jill Abbott to be deposited in a bank account unrelated to Prospect, its agents, or Bo Abbott.

30. The Scott and Jill Abbott Revenue Sharing Agreement included, among other covenants, an obligation of the agents to repay the investment.

31. In or about February 2017, Clifton Abbott advanced $40,000 under a verbal Agreement for Mutual Business Interest and Revenue Sharing (Clifton Abbott Revenue Sharing Agreement).

32. Thomas represented that the $40,000 advanced by Clifton Abbott would be used by Prospect's agents to finance and open offices in Montana and Washington state.

33. The Clifton Abbott Revenue Sharing Agreement provided that the $40,000 was to be repaid to Clifton Abbott with monthly payments of 5% of an amount equal to the gross operating revenue of the Montana and Washington offices less customer insurance premiums held in trust for the carriers until the $40,000 was repaid "separate and above the 5% monthly payment."

34. The Clifton Abbott Revenue Sharing Agreement further provided that the offices were to be opened and occupied within no more than 90 days of the effective date of the Clifton Abbott Revenue Sharing Agreement.

35. Thomas caused the $40,000 to be deposited in his personal bank account.

36. Upon information and belief, and in anticipation of likely evidentiary support after a reasonable opportunity for discovery, Thomas used all or a substantial portion of the $40,000 invested by Clifton Abbott in or about February 2017 for personal and other purposes unrelated to Prospect's business, rather than to allow Prospect's agents to finance and open offices in Montana and Washington.

37. Mr. Thomas's obligations under the Clifton Abbott Revenue Sharing Agreement were secured by a security interest in the office location, its furnishings, assets, and bank accounts.

38. The agents' assets, as referenced in both of the Revenue Sharing Agreements, included commissions receivable owed to them, as agents of Prospect, from insurance carriers.

39. In February 2017, Thomas sold a Nissan 3500 van, VIN No. 5BZAF0AA0GN851321 (Nissan) that he owned with Prospect and his minor son Silas, who was not of driving age, to a dealership in Bozeman, Montana, as the first of two related transactions.

40. The sale of the Nissan resulted in cash proceeds that Thomas, upon information and belief and in anticipation of likely evidentiary support after a reasonable opportunity for discovery, used in substantial part for personal purposes.

41. Contemporaneously with Thomas's sale of the Nissan, the dealership, as the second of the two transactions, sold the Nissan to Prospect and Bo Abbott.

42. In connection with the purchase of the Nissan, Bo Abbott assumed personal liability, and joint liability with Prospect, on a loan extended by First Interstate Bank in Billings, Montana.

43. Bo Abbott assumed personal liability on the First Interstate Bank loan in justifiable reliance on Thomas's representations that commissions received by Prospect would be available and used to repay the loan.

44. Bo Abbott would not have assumed personal liability on the First Interstate Bank loan had he known that Thomas did not intend to use commissions received by Prospect to repay the loan.

45. The Nissan could not have been purchased by Prospect alone, or by Thomas, because they had insufficient credit.

46. In February 2017, Thomas caused Connor Glynn, who had title to a 2016 Tahoe, VIN No. 1GNSKCKC9GR386636 (Tahoe), used by and for the benefit of Thomas and Prospect, to sell to the dealership in Ronan, Montana, as the first of two additional related transactions.

47. The sale of the Tahoe resulted in cash proceeds that Thomas, upon information and belief and in anticipation of likely evidentiary support after a reasonable opportunity for discovery, used in substantial part for personal purposes.

48. Contemporaneously with Connor Glynn's sale of the Tahoe, the dealership in Ronan, as the second of the two additional related transactions, sold the Tahoe to Bo Abbott.

49. In connection with the purchase of the Tahoe, Bo Abbott assumed personal liability on a loan extended by Wells Fargo Bank and secured by a lien on the Tahoe.

50. Bo Abbott assumed personal liability on the Wells Fargo Bank loan in reliance on Thomas's representations that commissions received by Prospect would be available and used to repay the loan.

51. The Tahoe could not have been purchased by Prospect alone, or by Thomas, because they had insufficient credit.

7

52. Bo Abbott would not have assumed personal liability on the Wells Fargo Bank loan had he known that Thomas did not intend to use commissions received by Prospect to repay the loan.

53. In September and November of 2017, Thomas obtained loans from Stockman Bank in Bozeman, Montana, and from Rocky Mountain Credit Union in Bozeman, Montana, respectively, both secured by the Nissan, by fraudulently concealing the fact of First Interstate Bank's loan to Bo Abbott and Prospect and its and claim of a lien on the Nissan.

54. Since February 2017, Thomas has used the Nissan and for both Prospect's business purposes and for personal and other purposes unrelated to Prospect's business.

55. Since February 2017, Thomas has used the Tahoe and for both Prospect's business purposes and for personal and other purposes unrelated to Prospect's business.

56. Since he and Prospect purchased the Nissan, Bo Abbott has made payments to First Interstate Bank totaling approximately $5,858.17.

57. Since he purchased the Tahoe, Bo Abbott has made payments to Wells Fargo totaling approximately $13,058.03

58. Since he purchased the Nissan and the Tahoe, Bo Abbott has not enjoyed the use or benefit of either vehicle.

59. As of the date of this Complaint, the debt on the Nissan is approximately $23,388.30, and the debt on the Tahoe is approximately $36,051.72..

60. On or about March 1, 2017, Patrick Ridens invested $50,000 in Prospect and its agents under promissory note, and an additional $50,000 under a separate Agreement for Mutual Business Interest and Revenue Sharing (the "Ridens Obligations").

8

61. Thomas represented that the Agreement for Mutual Business Interest and Revenue Sharing would allow Prospect and its agents to open an office in Oklahoma.

62. Bo Abbott co-signed the Ridens Obligations.

63. In May 2017, Thomas requested that Bo Abbott obtain three credit cards for Prospect, on which he would be personally liable, in order to obtain more credit, which Thomas represented would be was needed for Prospect's operations.

64. Bo Abbott understood that the credit was intended to serve as short-term financing until Prospect received commissions from insurance carriers early the following month.

65. Thomas, and to a lesser extent Bo Abbott, used the credit cards to pay outstanding invoices, and make purchases and obtain cash advances for Prospect's and its agents' business purposes.

66. Thomas caused the commissions from insurance carriers to be diverted for purposes other than repaying the credit card balances.

67. The balances on the credit cards remains unpaid as of the date of this Amended Complaint.

68. The total balances on the credit cards as of the date of this Complaint are unknown because they depend on information Thomas has not disclosed to Bo Abbott.

69. Despite demand, Thomas completely refused, until December 2018, to allow Plaintiffs to inspect Prospect's financial records, including financial records of Prospect's Montana and Colorado operations, and all documentation of financial obligations of Prospect, including security agreements and financing statements.

70. Thomas continues to withhold information as to whether the proceeds of the cash Prospect received from the purchase of the Nissan and the Tahoe, the credit card advances, and other investments by Plaintiffs have been used for legitimate purposes of Prospect.

71. Thomas continues to withhold other information, including financial records of Prospect, its agents, and their successors in interest, relevant to whether or not the proceeds of the sales of the Nissan and the Tahoe, credit card advances, and other investments by Plaintiffs have been used for legitimate purposes of Prospect and its agents.

72. Despite demand, Thomas has denied Plaintiffs access to, and refused to allow Plaintiffs to inspect, the Clifton Abbott note.

73. Bo Abbott has demanded return of the Tahoe, and that the Nissan be returned to First Interstate Bank.

74. Thomas has refused or declined to return the Tahoe to Bo Abbott.

75. Thomas has refused or declined to return the Nissan to First Interstate Bank or any of its lenders or lienholders.

76. Thomas has refused or declined to transfer his shares of Prospect to Bo Abbott.

**FIRST CLAIM FOR RELIEF**
(False pretenses, false representation and fraud, 11 U.S.C. §523(a)(2)(A))

77. The foregoing allegations are realleged and incorporated by reference.

78. Thomas obtained money, property, services, and an extension of credit by false pretenses, a false representation, or actual fraud.

79. The Note to Clifton Abbott was a security under Federal securities laws and those of Colorado, Kansas, Oklahoma and Montana (Securities Laws).

10

80. The Scott and Jill Abbott Revenue Sharing Agreement was a security under the Securities Laws.

81. The Clifton Abbott Revenue Sharing Agreement was a security under the Securities Laws.

82. Bo Abbott's underwritings of debts of Prospect and Thomas by incurring debt on the credit cards were securities under the Securities Laws.

83. In order to induce Clifton Abbott, Scott Abbott and Jill Abbott to purchase securities and make investments in Prospect and its agents, and to induce Bo Abbott to make cash advances, guarantee the debts of investors, and incur personal debts in connection with the sales of the Nissan and the Tahoe, Thomas made the following misrepresentations of material facts:

    a. that the retention rate of policies sold by Prospect was approximately 55%;

    b. that Thomas did not have the skill or proficiency to operate Prospect's EZLynx agency management system so as to produce a retention rate of 55% or otherwise adequately perform the tracking, reporting and other management functions of Prospect;

    c. that Thomas intended to provide information to Plaintiffs on a regular basis information about Prospect's operating revenues from its Colorado and Montana operations so that Plaintiffs could verify whether payments made to them under the revenue sharing agreements were in the correct amounts; and

        d.        that Thomas intended to use the funds invested by Clifton Abbott, Scott Abbott and Jill Abbott, and obtained from the sales of the Nissan and the Tahoe, for the legitimate business purposes of Prospect and its agents.

84.        The statements referenced in the preceding paragraph were untrue in material respects.

85.        Prospect's retention rate was in fact no more than 28%.

86.        Thomas made the statements and representations about untrue material facts either recklessly, knowingly, and with an intent to defraud Plaintiffs.

87.        Thomas made the representations with the intent that the Plaintiffs would rely on the representations.

88.        Thomas failed to advise Plaintiffs, and concealed from Plaintiffs:

        a.        That Thomas was obligated under a stock purchase agreement and settlement agreement (Settlement Agreement) in the approximate amount of $190,000, which agreement gave Thomas control over Prospect;

        b.        That Thomas intended to, and in fact did, use funds invested by Clifton Abbott, and Scott and Jill Abbott, for personal and other noncorporate purposes;

        c.        That Thomas intended to, and in fact did, use funds invested by Clifton Abbott, and Scott and Jill Abbott, to pay debts of Prospect, including working capital loans that were substantially for purposes other than the business of Prospect and its agents, rather than expand and grow its operations;

d. That Prospect could not be a viable entity even with the investments actually made by Clifton Abbott, Scott and Jill Abbott and Patrick Ridens.

e. That Thomas had executed an "independent contractor agreement" with a predecessor of Prospect that purported to allow Thomas to retain most of the commissions on insurance products he sold, and maintain a personal book of business, while leaving Prospect with significant debt;

f. That the purported "independent contractor agreement" was not legally valid.

g. That another individual, Connor Glynn, was also a party to an "independent contractor agreement" with Prospect that purported to allow him to retain most of the commissions on insurance products he sold, and maintain a personal book of business, while leaving Prospect with significant debt;

h. That Thomas claimed that Prospect had no beneficial interest in a substantial book of business and in commissions the book of business generated;

i. The specific allegations and merits of a lawsuit against Prospect seeking monetary recoveries and other relief filed by Protect Plus Insurance Brokerage, Inc., in June 2016 in Kings County, New York, Supreme Court asserting claims for, among other things, breach of contract, conversion of the plaintiff's book of business, and tortious or negligent interference with prospective economic benefit and with contract, and alleging among other things various that Thomas made various misrepresentations, that Prospect was operating its insurance business without proper licenses, with inadequate financing, and without an adequate management system or back office support, that Prospect improperly withheld commission payments, and that

13

      Thomas did not have sufficient experience to operate the business of Prospect and its processor unincorporated business;

j. The specific allegations and merits of a lawsuit, to which Thomas in February 2016 was added as a defendant, pending in Oklahoma County, Oklahoma by Oklahoma Agents Alliance, LLC, alleging that Prospect tortiously interfered with an insurance service contract and helped a party to the contract conceal competing business from Oklahoma Agents Alliance, LLC;

k. That the Settlement Agreement required Thomas and Prospect to indemnify the other parties against liabilities those parties might face in the Oklahoma and New York lawsuits;

l. That Prospect and the other parties to the Settlement Agreement faced the threat of a lawsuit in Mecklenberg County, North Carolina superior court in early 2017, for which Thomas and Prospect would be required to indemnify the other parties to the Settlement Agreement;

m. That Thomas and Prospect were obligated on numerous working capital loans and obligations;

n. That Thomas, in a personal bankruptcy he filed in 2011, was the defendant in an adversary proceeding alleging that a $160,000 debt was nondischargeable because of Thomas's false pretenses, false representation, fraud, and defalcation while acting in a fiduciary capacity, and settled that dispute by agreeing to pay the plaintiff $176,000.

o. That the $40,000 advanced by Clifton Abbott was insufficient to open offices in both Montana and Washington;

14

    p. That Thomas intended to, and did, apply the $40,000 advanced by Clifton Abbott to purposes other than opening offices in both Montana and Washington;

    q. That Thomas intended to, and did, use the Tahoe and Nissan substantially for personal purposes.

    r. That Thomas intended to, and did, use funds from his sale of the Nissan to the Bozeman dealership, and funds from Connor Glynn's sale of the Tahoe to the Bozeman dealership, for purposes other than Prospect's operating capital.

    s. That Thomas, after paying Bo Abbott a salary while he was employed by Prospect, intended to take position that the salary payments were instead advances against commissions.

    t. That Thomas did not intend to use revenues of Prospect to first pay debts incurred by Bo Abbott for the benefit of Prospect and its agents.

89. The facts set forth in the preceding paragraph were necessary in order to make other statements, in light of the circumstances under which they were made, not misleading.

90. Thomas had a duty to disclose the material facts that he concealed or failed to disclose.

91. Thomas concealed or failed to disclose those facts with the intent of creating a false impression of the actual facts in the minds of the Plaintiffs so that they would make investments in Prospect, and incur debt for Prospect's benefit, which they would or might not have done if they knew the actual facts.

15

92. Plaintiffs did not know, and in the exercise of reasonable care could not have known, of the untruths or omissions described above.

93. Plaintiffs justifiably relied upon the existence of the misrepresented facts and the nonexistence of the undisclosed and concealed facts to their detriment.

94. Plaintiffs would not have made their investments in Prospect but for Thomas's misrepresentations and failure to disclose material facts.

95. Thomas' conduct caused the Plaintiffs to suffer monetary damages and losses, including the amount of the investments by Clifton Abbott, Scott Abbott and Jill Abbott; the amounts of credit card and other debts incurred by Bo Abbott, interest on the Clifton Abbott note, interest has provided by the Revenue Sharing agreements, and/or interest under applicable law, accruing since the Note matured.

96. Thomas's fraudulent conduct as alleged in this First Claim for Relief violated the Securities Laws.

97. In attempting to recover the damages Plaintiffs have suffered as a result of Thomas's fraudulent conduct, Plaintiffs have incurred attorney fees in a civil action they commenced in the Jefferson County, Colorado, District Court, in a personal Chapter 13 bankruptcy proceeding Thomas filed in this court, which was subsequently dismissed, in the Prospect Chapter 7 bankruptcy proceeding, and in this bankruptcy proceeding and this adversary proceeding, all of which fees Plaintiffs are entitled to recover.

**SECOND CLAIM FOR RELIEF**
(False written statements of financial condition, 11 U.S.C. §523(a)(2)(B))

98. The foregoing allegations are realleged and incorporated by reference.

99. Thomas obtained for money, property, services, and an extension of credit from the Plaintiffs by use of a statement in writing—

   a. that was materially false;

   b. respecting Thomas's and Prospect's financial condition;

   c. on which the Plaintiffs reasonably relied; and

   d. that Thomas caused to be made or published with intent to deceive.

### THIRD CLAIM FOR RELIEF
(Fraud, defalcation in a fiduciary capacity, or embezzlement, 11 U.S.C. §523(a)(4))

100. The foregoing allegations are realleged and incorporated by reference.

101. Thomas intended to deprive Plaintiffs permanently of the use or benefit of the amounts they invested.

102. Thomas embezzled property of Prospect, including commissions and its book of business, which was he represented would be used to repay loans and investments to Plaintiffs and to discharge debt assumed by Bo Abbott,

103. Thomas has converted the Tahoe and the Nissan for his own use.

104. The conduct of Thomas as alleged constituted fraud, defalcation in a fiduciary capacity, and/or embezzlement.

### DEMAND FOR RELIEF AND JUDGMENT

Plaintiffs therefore request that the Court determine the amount of Thomas's debts to Plaintiffs, including prejudgment and postjudgment interest, attorneys' fees and costs, and that all such amounts are nondischargeable, and enter judgment in favor of Plaintiffs and against Thomas, and such other relief as the Court deems proper.

Dated: October 24, 2019

        s/ David Lichtenstein
        David Lichtenstein, *pro hac vice*
        Law Office of David Lichtenstein, LLC
        1556 Williams Street, Suite 100
        Denver, CO 80218
        Telephone No: (303) 831-4750
        Email: dave@lichtensteinlaw.com

        Harold V. Dye
        Dye & Moe, P.L.L.P.
        120 Hickory Street, Suite B
        Missoula, Montana 59801-1820

        Attorneys for Plaintiffs
        Clifton Bo Cleveland Abbott,
        Clifton Cleveland Abbott,
        W. Scott Abbott, and Jill Abbott

**CERTIFICATE OF SERVICE**

The undersigned certifies that on October 24, 2019, he caused a true and correct copy of the foregoing to be served electronically on the following:

Richard J. Samson, Trustee
310 W. Spruce Street
Missoula, MT 59802

Office of the U.S. Trustee

and that in addition, the undersigned states under penalty of perjury that service by emailing, and mailing a true and correct copy, first class mail, postage prepaid, was made to the following:

Christopher Gregg Thomas
P.O. Box 11718
Bozeman, MT 59719

Christopher Gregg Thomas
9 Sunnyside Trail
Bozeman, MT 59715

                                                s/David Lichtenstein
                                                David Lichtenstein, *pro hac vice*
                                                Law Office of David Lichtenstein, LLC
                                                1556 Williams Street, Suite 100
                                                Denver, CO 80218
                                                Phone: (303) 831-4750
                                                E-mail: dave@lichtensteinlaw.com